This is In Re the Marriage of Gerald S. Culp and Susan K. Culp, now known as Fox, 4090605. We have for the appellant, Nolan Lipsky, and for the affilee, Shannon McMasters. Please proceed. May it please the court and counsel, this case involves the interpretation of an agreed marital settlement, I should say marital settlement agreement, which was incorporated in an order of court on September 2nd of 99. In that agreement, among other things, the parties provided for the distribution and division of the petitioner's S.E.R.S. pension. The agreement provided that the petitioner had certain pension benefits through the S.E.R.S., which were valued at approximately $84,000 as of April 20th, 1999. That was the date of the judgment of dissolution. The retirement benefits, in fact the word was said retirement benefits, were to be equally divided as of that date of April 29th of 99, pursuant to a quildro, which was to be entered by agreement of the parties or by order of court. Thereafter, in June of 2001, a subsequent order was entered, which reserved the entry of the quildro, I think until such time as he actually retired, because the language of that subsequent order was to the effect that the petitioner was to report to the respondent within 30 days before making an election to retire. Last year, the respondent submitted to Judge Goronsky a proposed quildro, which used the coverture formula to distribute the S.E.R.S. pension of the petitioner. The trial court, over our objection, found the quildro to be appropriate and entered an order upon the petitioner to consent to the entry of that order. The issue before you is whether the party's intent, as expressed in the MSA, was to divide the petitioner's retirement benefit pursuant to the coverture formula, or whether each party was to receive one half of the expressed value of $84,000 as of the date of dissolution. This is a question of law, which under the cases is to be determined by the court. In order to do that, the court must consider the ordinary rules of contract constructions, which should be applicable to construing this contract or the marital settlement agreement to ascertain the intent of the parties. Obviously, the best indicator of the party's intent was the language of the agreement. Generally speaking, a written agreement must be presumed to be what the parties intended it to be. In this case, I think that's even more so, because this is an agreement drafted by counsel for their clients, negotiated by counsel, and entered with the consent of their clients. In any event, the language of the contract or the marital settlement agreement clearly provides for evaluation of the pension as of the date certain, and then goes on to say that is to be divided in one half. Frankly, I wouldn't be here today if included in that marital settlement agreement was language to the effect that this pension is to be divided by a quildro using a fractional formula, the numerator of which would be the number of months of service. I'm sorry, the number of months of the marriage. The denominator would be the number of months of service. You multiply that by the monthly pension benefit, divide it by two, that's the marital share. That language was not included. In fact, what happened here was Judge Skowronski inferred that language from the language that is included within the marital settlement agreement and entered a quildro using that formula when the same was not bargained for by either of the parties. Now, I don't want the court to believe that a coverture formula is mandated by the quildro because it isn't. We've attached to our appendix at pages 44 and 54 the quildro forms which were in effect at the time this agreement was entered into and what is in effect today. And if you look at those prescribed forms by the state retirement system, you will see that the first way to divide a pension is by placing in the document the sum certain along with the capability of inserting the formula later on in the form. So in absence of the expression of the intent to use the coverture formula, we can't understand why the judge would use that because clearly the language of this agreement does not provide for such. I think one of the most important rules of construction is the rule set forth in this court's Blossom decision, which is cited in our brief. And in Blossom this court held that the court has no right to construe the intent of the parties in an endeavor to make a better contract for either of the parties than that which they've made for themselves. Because obviously in this instance the coverture formula results in a direct benefit to the respondent in providing her with a greater share of the petitioner's pension. What are the numerical differences here? 42 versus? He hasn't retired and I don't have an estimate of his value. But I can say this to the court to give it some guidance. At the time this order was entered, he was a master sergeant in the state police. Today he is a captain district commander. So there obviously to me is a substantial difference between earnings from today or yesterday. And I think counsel put in her brief what his salary was at the time when they went back to court to get an increase in maintenance. I thought she said it approximated $75,000. In all due honesty to the court, I think it's over a hundred and something today. So there is a distinction obviously because the latter part of that salary comes into play in determining the pension benefit. In any event, as I said earlier, I believe the court's decision was an effort to do that. And if there's an agreement between the parties as expressed in the marital settlement agreement, I don't think you can make a new agreement. The other thing that I want the court to realize, the mere fact counsel and I may have different interpretations of how you should construe the language at issue that doesn't necessarily render the agreement per se ambiguous. That's a determination that you ultimately have to make if this language is ambiguous. And then I would indicate to the court alternatively it must be sent back to the trial court under some case law that we've cited to conduct an evidentiary hearing pursuant to which extrinsic evidence would be admitted to establish or hopefully establish the parties' intent. This case was not decided pursuant to an evidentiary hearing. We agreed to submit written memorandum to the court arguing our beliefs as to how it should be interpreted, but there was never an evidentiary hearing conducted. Counsel believed that the interpretation of this language is that the intent was to use a quill drug using the reserve jurisdiction approach, and therefore the coverture formula was appropriately used. The language, quite simply, the language of the document doesn't say that. All they had to do was say that, and they did. So, I mean, the mere fact that they went to the extent of valuing the pension, which we would ordinarily see in the immediate offset as opposed to the reserve jurisdiction approach, has to be given some meaning. You just can't exclude that language from the document. And the only inference that you can glean from that is that they intended to divide the pension based upon that number, or one-half of that sum. And if this is the agreement that the respondent entered into, there's a case that holds, I think it's a second district case cited in the brief, and I may be butchering the pronunciation, Wank of E.N.C. And that case holds that even though there may be a great disparity between the amounts received by the parties, that shouldn't be a consideration for the appellate court when it was done pursuant to an agreement. And I would ask you to read that case and look at that language. But in this case, there are several other things that I think the trial court did erroneously in addition to dividing the pension by use of the Coverture formula. The Quill Drove that the court approved also included that a provision that the respondent was to receive a portion of a termination refund. Maybe a moot point, because obviously after these many years, I don't think he's going to terminate and leave service. If he leaves service, he's going to retire because he's reached retirement age, quite frankly. And that's why the Quill Drove was sent in when it was. But also, there's another provision added, and that's it gave her a portion of the lump sum death penalty that I think a surviving spouse would get. He is married, remarried. But be that as it may, neither of those provisions, giving her these things, was included within the marital settlement agreement. So the court went ahead and did that. Why? I don't know. Because those two elements are not necessary parts of a Quill Drive. All you're doing is checking a box as to whether you're giving that person that right. And there was never an agreement to bestow those benefits upon her. Finally, the agreement is silent itself as to the manner in which the Quill Drove was to be drafted. Do we use a lump sum? Do we use the culvature formula or something else? And in this case, I think when you look at everything together, the parties decided that she was to get a $42,000 benefit. The Quill Drove was going to be used as a device to get that benefit. And if you use a sum certain, the parties, by virtue of the language of the agreement, had the opportunity to reach an agreement as to what monthly amount of money she would receive until the $42,000 was paid. That could have been inserted in the Quill Drove. She could have gotten every penny of his monthly benefit until the $42,000 were paid, or a lesser amount. And if they couldn't agree, then the court was asked to make that decision. So by using the culvature formula and providing for things that were not included within the scope of the original language of the Marital Settlement Agreement, the court basically modified the agreement. It disregarded the plain and ordinary meaning of the language, disregarded the intent governing the use of the valuation number put into the Marital Settlement Agreement, and decided this is what the parties intended. And quite frankly, we believe that decision is erroneous. I'm concerned about another thing, and that is in the brief of counsel, there's numerous items of extrinsic evidence contained in there to support her position, none of which was heard before the trial court. Did you distract those questions? No, I did not. But in any event, I still think I can ask you in your ultimate decision not to take that into consideration because it is evidentiary in nature. You know, and I don't know if I said this earlier, but I think it bears repeating. You have the immediate offset approach and the reserve jurisdiction approach. And I think what these two attorneys did, for lack of a better explanation, is created a hybrid. They used a little from the immediate offset because they valued the pension. They didn't then and there offset it against marital property. They chose to provide that it was going to be distributed when the retirement was obtained, received by the petitioner. The parties agreed to that for whatever reason. And that's what I think happened here. That's the only way you can define what they have done. There's a little bit of both. It's a hybrid. And that's what they agreed to. I'm sorry. I didn't follow that. Why is that a hybrid? Well, because it is. Is it the time? No, it has features of both. The immediate offset would value the pension and then offset it against marital property. They didn't do that. They chose to reserve the distribution until he actually retired. So it has a little of both features. That's why I term it a hybrid. If they didn't value it, then I don't think I could say that. That's why I think it's important to give credit to the valuation language in the agreement. Can you distinguish the Richardson case? Yes. I think the Richardson case, there was no valuation included in that. And that's the difference between this case and Richardson. Here there's a specific valuation. Richardson did not contain such. There is no rational reason why they would include the $84,000 number in there if the parties didn't intend to divide up the benefit pursuant to that number. They didn't have to put it there. Period. They could have just gone on and say it would be divided pursuant to the quill drill and then to make matters easier for everybody, myself included, say use the Colvin's reform. Divide it by the fractional form. It's not there. I think I can go on ad infinitum because the issue is limited to how you are going to determine the intent as contained to the language in the marital settlement agreement. And I think I've given you some basis to do that. You're to use the ordinary rules of contract construction. I'd like you to look at the Wasson case, the Wayne case in particular, to assist you in doing that. There's also a Splendor's case in this court that has some application to this. And I think you, after you do that, would agree with me that the intent was to divide equally the $84,000 as of the date of the dissolution. Now, if for any reason you determine that this agreement is ambiguous because you can't determine if I'm right, she's right, I think you have only one choice, and that's to reverse and remand, send it back to the trial court to conduct an evidentiary hearing where hopefully extrinsic evidence would be introduced to determine, which would give the trial court the ability to determine the party's intent with more certainty. What would the Quill-Drove do if this was a specific definite amount that wasn't to be paid until retirement? It would distribute some certain over maybe a matter of months, over maybe a year. Did you submit such a Quill-Drove? No. No, we argued against the Quill-Drove, the language of the Quill-Drove, because the issue before the trial court was... No, did you submit your own? No, no. Because what we argued was, the issue before the trial court was whether or not the Coverture formula should be used. We argued it shouldn't be used. Well, but something has to happen. Even if you're right, something has to happen with those dollars. Well, but there's one other option that I did have. My client was willing to pay the $42,000 up front. Up front when? Now, if it would be accepted today. Any other questions? No. Thank you, Ms. Wolitski. Ms. McMaster? Thank you, Ms. Wolitski, for the counsel. The marital settlement agreement entered into by the parties simply states, said retirement benefits should be equally divided between the parties as of April 20, 1999, pursuant to a separate Quill-Drove to be entered by agreement of the parties or by the court. It does not say the respondent is to receive $42,000 of the retirement. If it was going to be just a split like that, do we need a Quill-Drove? I do not believe you would have at that point in time. If that was the intent of the party at that time, that Ms. Culp would receive $42,000, then I believe at that time a judgment would have been entered on the $42,000 and payment of that $42,000 would have been addressed, whether it was monthly payments beginning immediately, weekly payments. Well, realistically, he didn't have it then, so wouldn't they have deferred it until he retires? Possibly, but again, I think at least judgment would have been entered so she could have started. If that was what she was getting locked into, then judgment would have been entered so she could have started accruing statutory interest from that point on. So isn't it at best ambiguous when you've got the entry of the Quill-Drove reserved, a specific amount of value, $84,000, to be divided equally? I believe Mr. Lipsky's argument that it's kind of a hybrid is something that you can buy into. It does appear that by putting a figure in there, it's unclear what the purpose of that figure was. His argument is the purpose of that figure is to show she was only going to get half of that. Our argument is it's just to show the approximate value, because it wasn't a definitive value, it was an approximate value, as of that time to show exactly that, the size of it. The additional language in there concerning the division of it by providing for a Quill-Drove, we believe, and our argument is, that it wasn't the party's intent to just restrict her to 50% of the approximate $84,000, but yet to give her half of the marital proportion, which at the time of the dissolution of marriage, and even at the time this agreement was being entered, was not ascertainable because the program that he was in being a defined benefits program. So the amount of the marital proportion you cannot determine until he's retired, because it's calculated based upon the total number of years that he's participated in the program and his salary at the time of retirement. So even as we stand here today, the value of that marital portion is still unascertainable because he's still employed and still working. And that's more than 11 years ago. I assume he gave notice he's going to be retiring, and that's why the Quill-Drove... I assume he did. I honestly cannot say for sure he did, because I was not involved in the case at that time. Petitioner also argues that because the Marital Assignment Agreement calls for a Quill-Drove, it doesn't mean that respondent is entitled more than the alleged $42,000, nor does it provide for her to incur the cost of living adjustments or interest. And according to the Taffet case that I cited in my brief, at the time of the dissolution of marriage, the pension benefit is a marital asset. And at that time, she became basically a co-owner of Petitioner's pension benefit. She was to receive, according to the Assignment Agreement, it was to be divided equally, that she's an equal co-owner of the marital portion. To argue that her interest is frozen at a lump sum and not able to partake of the increase of those benefits just based upon the years going by, would result in the Petitioner, who's also an equal co-owner, receiving more of the same thing than what the respondent's receiving. So if it's equal, it has to be equal. And to freeze her interest and not allow her to receive part of any cost of living or interest on it would basically be against the agreement where she was to receive an equal interest. As Petitioner's counsel previously argued, there wasn't an evidentiary hearing held. The trial court asked both sides to submit memorandums arguing their point as to whether the quid pro quo as previously submitted was correct and also whether the trial court should enter it. At that time, Judge Skronsky found that this wasn't a case that the language was unambiguous. He found that the language of the Settlement Agreement was clear, that it did not call for the respondent to receive a flat $42,000 of Petitioner's settlement. He also then ordered that the BILDRA as tendered for Respondent's counsel at the time be entered. And that did use what is known as the Hunt Formula. And as Petitioner's counsel cited, there's two ways to value a pension that's unmatured. You have the immediate offset approach and then the reserve jurisdiction approach. It's clear from this case that you cannot do the immediate offset approach here because there wasn't any marital assets to immediately offset Respondent's interest in the pension. So that leaves us with this being a reserve jurisdiction approach. And basically, jurisdiction is reserved up until the time that valuation is determinable, which is at the time the Petitioner would be retiring, to determine the value of the marital portion. And so that's why we believe that the Hunt Formula, as used in the BILDRA, proposed was correct and should be supported by this Court as well. Again, I do agree with Petitioner's counsel that should this Court find that the language is unambiguous and it's not clear what really the parties intended, then I believe it should be remanded back to the trial court for an evidentiary hearing to be able to see if we can determine what the parties intended for the time. Thank you. Yes, I just want to comment on a couple of things. I thought counsel said that the reason they waited so long was they didn't know the monthly retirement benefit in order to complete the cloture. If you look at the appendix of our brief at A-11, you'll see that they didn't know the retirement benefit in the fiscal year. It was all done by putting a 50% per month of the marital portion of the benefit and then the marital portion is defined by using a formula that I call the Coverture Formula, the same as the Hunt Formula. So the cloture could have been submitted insofar as it was a reserve jurisdiction approach at any point in time. You didn't have to necessarily wait until the man retired. That's point one. The other thing is, again, well, let me say this because the question was asked of hers. He is not retired. He's still working at this point in time. That much I do know. And to divide the pension by a quilter, which would work to enhance the amount of money that she indicated by agreeing to the language of the marital settlement, is when we talk about equity and fairness, may not be fair to my client because he might have given up other things. And the question arose as to, well, why didn't he pay her sooner? If you look, there was a maintenance obligation imposed upon him. And at that time, I guess he was making what he was, but there was child support, college contribution to be paid, maintenance to be paid. He obviously didn't have the money. And I assume that's why it was deferred until he was getting the benefit. And those factors in his life would have been terminated. Mr. Lipsky, there's an order in the file that was apparently entered after a maintenance review hearing that specifically reserves entry of a quill drug until 30 days prior to making any application for retirement or request for retirement benefit. Right. That's the order. I think that was entered in June of 2001. Yes. I think I alluded to that. Hasn't the court ordered that that is the time when the quill drug shall be entered? Well, Your Honor, if I can give you some history, what happened here, if you recall. And I know I'm speaking from stuff that wasn't considered by anyone, but you asked the question. At that time, if you recall, the quill drug just came into being. And this was an agreed order, too, I think, the one in June. It doesn't say. Supplemental. I know that. It's entitled supplemental. Oh, no, that one is. Agreed supplemental order. The order of 01 was not. Well, and that reserved the quill drug, too. Yeah, the first one did, too. Yeah, well, I'm talking, well, yeah. But the reason for all this was the quill drug just came into being at that time. And from what I've been told, they submitted two quill drugs to the state, which was rejected. And frankly, they gave up until they became more experienced in drafting. And that's actually what happened. Well, the quill drug was around when I was still on the bench, and that would have been in 98. So it at least didn't exist until a couple of years. It went into effect in 99. I think we got the, we attached the statute when it went into effect in our appendix. And I thought it said 99. I may be mistaken. But it is in there for you to consider. It's in the appendix. Let me see if I can find it. It should be around page 54. It's 51. Well, you may be right, because it says 97. So it was just two years old at the time. I do know this. So did the quill drug change the reserve or coverture? No, it didn't. No, not at all. I mean, it's the same thing. A quill drug is a quill drug, except it's from the state. But the coverture formula is the same as we've always used in dividing whether it be public or private. Anything else? No, thank you. Okay. We'll take this matter under advisement and adjourn for the day.